IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.                                                                                           CRIMINAL ACTION NO. 3:05-00185

LUMUMBA JOMO KENYATTA EARLE,
    also know as "Tyree Jones"

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Lumumba Jomo Kenyatta Earle's motion to suppress evidence. The Court held a hearing on the motion on November 7, 2005. Upon consideration of the evidence presented at that hearing and the arguments by counsel, the Court agrees with the defendant and **GRANTS** the motion to suppress for the following reasons.

### I.
### FACTS

The only individual who testified at the suppression hearing was Detective Shane Bills of the Huntington Police Department. At the hearing, Detective Bills testified that he was directed by his supervisor to go to 308 Marcum Terrace in Huntington, West Virginia, because there were complaints of drug activity at that apartment. Detective Bills and another officer, who were in plain clothes, approached the apartment from the rear and saw the defendant sitting on the back porch of the apartment. At the time, the defendant had his left hand inside his shirt, but at some point as they approached, Detective Bills stated that the defendant stood up, took out a cell phone and appeared to be making a phone call. As the officers got closer, they identified themselves as police officers. Detective Bills testified that the defendant got wide-eyed and looked nervous and appeared to be looking past them to see if he could run. There was no evidence, however, that the

defendant made any gestures or attempts to flee. The defendant was asked if he had any weapons. The defendant did not respond to the question. Detective Bills stated he was concerned for their safety, and he waited until two additional officers arrived on the scene to pat down the defendant. During the pat down, Detective Bills felt chunky substances in a plastic bag in the defendant's pocket. Detective Bills asked the defendant if he had crack, and the defendant answered in the affirmative. The officers then found a Hi-Point .380 handgun in the defendant's waistband. The defendant was placed under arrest.

## II.
## DISCUSSION

In his motion to suppress, the defendant argues that the stop and search and seizure were illegal and, therefore, the evidence obtained from the search must be suppressed. In *United States v. Burton*, 228 F.3d 524 (4th Cir. 2000), the Fourth Circuit outlined the applicable legal principles governing these types of situations. In *Burton*, the Fourth Circuit explained that the Fourth Amendment is not implicated or violated merely if a law enforcement officer approaches and talks to an individual in a public place. 228 F.3d at 527 (citations omitted). When such "police-citizen encounters" occur, officers do not have "to articulate any level of suspicion or justification for their encounters[,]" but the citizens encountered in these situations may ignore the officer and walk away. *Id*. (citing *Terry v. Ohio*, 392 U.S. 1, 33 (1968) (Harlan, J., concurring); other citations omitted). However, a "seizure" occurs when an officer restrains the liberty of such person by way of physical force or show of authority. *Id*. (citing *Terry*, 392 U.S. at 19 n.16). Therefore, "police officers may not place their hands on citizens 'in search of anything' without 'constitutionally adequate, reasonable grounds for doing so.'" *Id*. (quoting *Sibron v. New York*, 392 U.S. 40, 64 (1968)).

To conduct an investigatory detention, a police officer must have "a 'reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause.'" *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Such "[r]easonable suspicion is something more than an inchoate and unparticularized suspicion or hunch, and it is the government's burden to articulate facts sufficient to support reasonable suspicion[.]" *Id.* at 527-28. (internal quotations marks and citations omitted). If an officer has made a lawful investigatory stop, the officer may conduct a search for weapons if the officer "'has reason to believe that the suspect is armed and dangerous.'" *Id.* at 528 (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). The predicate to conducting a protective search, however, is that the officer first had a reasonable suspicion to support the investigatory stop. As Justice Harlan explained in his concurring opinion in *Terry*:

> [P]olicemen have no more right to "pat down" the outer clothing of passers-by, or of persons to whom they address casual questions, than does any other citizen. . . . [I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection.

392 U.S. at 32-33 (Harlan, J., concurring). In quoting this section, the Fourth Circuit in *Burton* summarized the law as allowing officers to question citizens they may encounter, but in order to

conduct a protective search, "an officer must first have reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Burton*, 228 F. 3d at 528.

Applying this standard to the facts of *Burton*, the Fourth Circuit found the search of the defendant was unlawful. In *Burton*, the defendant was standing at a pay phone when four police officers, who were serving warrants in the area, approached him. *Id*. at 526. One of the officers identified himself as a police officer and requested identification from the defendant. The defendant did not respond. The officers asked several more times, but the defendant continued to remain silent. The officers then asked the defendant to take his right hand out of his coat pocket. When the defendant refused to do so, the officers asked again, and the defendant did not respond. At that point, one of the police officers grabbed the defendant's hand from his coat, a struggle ensued, and a gun was removed from the defendant's possession. *Id*. In finding this search was unlawful, the Fourth Circuit noted that it was uncontested that the officers had no reason to believe the defendant was engaged in any criminal activity. *Id*. at 528. Although one of the officers testified that the defendant's failure to respond to their questions and remove his hand from his pocket made them uneasy and concerned about their safety, the Fourth Circuit found there were no objective facts which would warrant an investigatory *Terry* stop. Specifically, the Fourth Circuit stated that the defendant had the right to remain silent when the police questioned him and his "'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for detention or seizure[.]'" *Id*. at 529 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991); other citation omitted). In sum, "in the absence of reasonable suspicion, an officer may not frisk a citizen

merely because he feels uneasy about his safety." *Id.*  Therefore, the Fourth Circuit determined the handgun must be suppressed.

In *United States v. Mayo*, 361 F.3d 802 (4th Cir. 2004), the Fourth Circuit discussed *Burton* and emphasized that the focus must first be on whether the officers were justified in conducting an investigatory stop before proceeding with a protective frisk. 361 F.3d at 807.  The Fourth Circuit further explained that a court must look to the "totality of the circumstances" to determine whether an officer had a "particularized and objective basis for suspecting legal wrongdoing." *Id.* at 805 (internal quotation marks and citations omitted).  Such circumstances may include whether the stop was in a high-crime area and whether the suspect was evasive or nervous.  However, the court said "[a] suspect's refusal to cooperate with police, without more, does not satisfy *Terry* stop requirements." *Id.* (citations omitted).

In *Mayo*, officers saw the defendant standing in the middle of a street, talking to someone on the side of the street in a high-crime area. *Id.* at 803.  When the police car approached the defendant, the officers observed the defendant put his hand into his jacket, turn 180 degrees, and walk between two buildings in an apartment complex that was posted with no trespassing signs.  The officers also observed the defendant either had something heavy in his pocket or was pushing his pocket down with his hand.  An officer testified that he believed such action was consistent with someone attempting to maintain control of a weapon. *Id.*  The officers drove around the apartment complex and, when the defendant emerged from the other side, the defendant saw the officers and stopped momentarily before he began "walking along the side of the building." *Id.* at 803-04.

Thereafter, the officers began asking the defendant questions and asked him to remove his hand from his pocket. *Id*. at 804. The defendant removed his hand and one of the officers observed that the defendant's "'eyes were extremely wide, his mouth was slightly agape, and it was almost like nothing registered with him. It was almost as if he was in shock' . . . [and his] shirt was 'fluttering . . . as though he was shaking.'" *Id*. When asked if he had a weapon, the defendant said nothing, but he averted his eyes and looked downward. Fearing for his safety, one of the officers patted down the defendant and found a semiautomatic pistol in his coat pocket and marijuana and several rocks of crack cocaine. *Id*.

In looking at the totality of the circumstances in *Mayo*, the Fourth Circuit found there was a sufficient basis to conduct an investigatory stop under these facts. *Id*. at 808. The Fourth Circuit pointed out that the stop occurred in a high-crime area. The defendant acted in a way that would suggest he may be carrying a gun. The defendant's pocket appeared to contain something heavy. The defendant attempted to evade the police and, when he eventually was confronted, he was visibly nervous. *Id.* at 807-08. Under these circumstances, the Fourth Circuit found the officers had a reasonable suspicion, supported by articulable facts, to stop the defendant and pat him down for their safety. *Id*. First, the officer must have reasonable suspicion that criminal activity is afoot. If so, then the officer may conduct a protective frisk when there are reasonable grounds to believe the suspect is armed and dangerous. The Fourth Circuit concluded that the officer had a reasonable suspicion that the defendant illegally possessed a concealed weapon.

Turning to the facts of the present case, the Court finds that these facts are more closely aligned with the facts of *Burton* than they are to *Mayo*. Here, Detective Bills was directed to go to 308 Marcum Terrace by his supervisor. The Government produced no evidence regarding the source of this information and whether or not the source was reliable or credible. Indeed, the Government put forth no evidence that they were acting on anything more than an anonymous tip and the extent of Detective Bills' information was limited to the fact that there was suspected drug activity at the apartment.[1]

When the police officers went to Marcum Terrace, they approached the apartment from the rear of the building and, at that point, there was nothing that would indicate that they were police officers. It was approximately 9:00 p.m. and after dark. The defendant was merely sitting on the back porch with his hand in his shirt and at some point appeared to be making a cell phone call. The officer did not testify that he observed anything, such as an object or bulge in the shirt, suggestive of a concealed weapon. The officers identified themselves as officers as they approached, and Detective Bills said the defendant looked wide-eyed and nervous and appeared as if he were looking for somewhere to run. The defendant did not, however, exhibit any evasive behavior or gestures nor attempt to flee, and the officer even acknowledged that the defendant sat back down when the officer asked him. Although the defendant refused to answer the officers' questions about having any weapons, that factor, by itself, does not weigh in favor of a finding that the defendant

---

[1] Clearly, the Government has put forth no evidence that the tip in this case arises to the same level of the tip found in *United States v. Christmas*, 222 F.3d 141 (4th Cir. 2000), where the Fourth Circuit held that a tip from a face-to-face encounter with an informant may be sufficient to create a reasonable suspicion to conduct an investigatory stop.

was engaged in criminal activity. *See Burton*, 228 F.3d at 529 (stating a "'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for detention or seizure'" (quoting *Florida v. Bostick*, 501 U.S. at 437; other citation omitted)). At best, the Government established that Marcum Terrace is known for being a high-crime area and the officers went to apartment 308 based upon information that was not shown to be any more reliable or credible than an anonymous tip that there was drug activity occurring on the premises. Although the defendant appeared nervous to the officers, the Government presented no evidence that there was any indication that the defendant was engaged in any illegal activities before they conducted the search. Given the totality of these circumstances, the Court finds that the Government has not shown that the officers had a reasonable suspicion, supported by a particularized and objective basis, that the defendant was engaged in criminal activity. Therefore, the Court finds that the officers did not have a reasonable suspicion sufficient to justify an investigatory stop and the subsequent protective search.

## III.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court **GRANTS** the defendant's motion and directs that the items seized as a result of the search be suppressed. The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel and the defendant, the U.S. Attorney's Office, the U.S. Probation Office, and the U.S. Marshals' Service.

ENTER: November 9, 2005

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE